21-2934. And let's see, we have Mr. Langone for the appellant. Is that correct? Yes, your honor. Am I saying that right? Yes, you are, your honor. And then we have Mr. Denehy for the appellee. Correct. And Mr. Langone, I understand you would like to reserve two minutes for rebuttal, is that correct? Yes, thank you, judge. Why don't we get the calendar, the clock teed up. There we go. Mr. Langone, you may proceed whenever you're ready. Yes, your honors. May it please the court. I'm going to go to the harmless error analysis of this case. We had the district court and the state supreme court appellate division both make a determination that there were certainly a blatant, a brutal violation and there was a Brady violation. I respectfully submit that I need to show this court the harmless, the harmfulness of the errors in light of the notion that hard cases make bad law. This may seem a little technical, but on the Brady question, is the question, the question on the harmless error, the question is whether there actually was a Brady violation because the Brady rule builds in an affirmative materiality requirement that the defendant to establish a Brady violation has to show, not just rebut some claim of harmless error where the burden is on the prosecutor, has to demonstrate that the information was material in the sense that it would likely have affected the verdict. Well, I think that those two concepts of harmlessness and materiality kind of dovetail. If I might just do a little bit of a presentation because there were two cases that were joined in one trial mixed with another trial that was going on at the same time. It was a two jury situation. So I'd like to begin by stating to the court the deliberations in this case was three days. So right there we know that this was not an overwhelming case. The jury was seriously deliberating. But the question before us is not whether we would find that. The question before us on each of the two things is whether New York was unreasonable in saying that this was not sufficiently important in the foul facts of the case so that it would have mattered. And for me, the problem in this case is that I might well think that what was said about the underlying major witness was important or the same about the Bruton. But it's very difficult for me to say that in this case, New York was unreasonable in saying it wouldn't have mattered. That it wouldn't have mattered. Well, let me continue on. And that's why, by the way, I think your potentially strongest argument is the argument about the combination of the two. Well, it is. Because there, New York has made no ruling. So while that's a difficult argument, at least as to the combination of the two, I am not bound to say New York was unreasonable. There, if I bought your argument, I have problems with it. But the combination of the two, at least it's one where I can decide rather than just say is New York being unreasonable? Yes, and Mr. Langone, that's precisely why I asked the question that you did not answer, which is if there was no Brady violation, then there is no combination of errors to be assessed. Then there is only one error, the acknowledged error under Bruton, which was held by the state court to be harmless. So the allegations of this case in terms of the Brady violation, we know that just as the trial was beginning, an attorney walked into the courtroom and had a sidebar conference with the judge, a state court judge who was getting ready to try this case, with the district attorney to quash the subpoena to have a witness testify. This witness, on two separate occasions, told the FBI, not the defense, she was never approached by the defense, they didn't know about it. This is the defendant's ex-wife? Was she the ex-wife at the time or still wife? So what happens is- Just to be clear, no. Yes, sure. It's a quick question here. So remember, the case is, this is a 1992 case, it's not tried until 2007, it's almost 14 years. Right, so at the time of trial, were they married or not? At the time of the trial, they had long been divorced. Okay, that was my only question, I don't want to divert you from Judge Lynch's question, I'm sorry. She had moved out of state and had changed her name. The defense was in prison for 10 years, I think, at that point. Had no contact with her. She had married, remarried, and she had children. She tells the FBI, on two separate occasions, when they go to her, because they know this tennis bag is the central piece of evidence because it supposedly contains the murder weapons on two cases. And proving Criveau's connection to these murder weapons, to this tennis bag, was important to establishing his involvement in the murder. It was corroboration of the alleged, to satisfy the accomplished corroboration rule according to the judge's jury instructions. So it was essential to get this into evidence. The tennis bag evidence was also the basis for a lot of the uncharged crimes that were supposedly admitted for the purposes of connecting Criveau, through dominion and control, to those guns. The whole purpose here was to connect Criveau to those guns. So you're saying there was a whole lot of other evidence put in there to connect him to the guns? Uncharged crime evidence, that all comes in through the tennis bag. So in terms of the materiality of the bag that's not turned over, you want to know if it's Brady, if it's material. Well that's coming in no matter what. That evidence is coming in. I understand you're saying there would have been corroboration evidence as to that. But the evidence about the bag still would have come in, and all the other crimes evidence still would have come in. So it's not as though had the impeachment evidence been turned over, none of that evidence would have been admissible. You're just saying there would have been a change in the mix of evidence on that point, right? There would have been a change of mix, it would have changed. But all the corroborating evidence would have been untouched and not impeached by that particular piece of evidence, right? Well, let me say this. The relevance, the probative value of the uncharged crimes, again, was the connection to the gun, Criveau and the gun. Right, and that would have come in and been unaffected. Had the judge known that the witness who supposedly gave that gun to Sarkisov twice denied that to the FBI who went to them on two separate occasions, who went to her on two separate occasions. That's a material consideration in terms of what you were going to allow in. Why? I don't understand that. It's separate evidence. It doesn't go to the credibility of any other witnesses on the corroborating information. The government still wants to prove the fact of the guns. The corroboration comes in or not. It would seem to me if there's going to be impeachment of the witness on that point, all the more reason to allow more of extrinsic evidence to come in to fight over the point. If I were trying that case and that happened to me, the first thing I would do is ask for an in limine hearing immediately on the truthfulness of the allegation. Because if in fact he did... I mean, why would the jury not get to decide the truthfulness of the allegation if you would impeach the person before the jury? I don't understand why the judge would make a preliminary determination. The judge isn't going to keep a witness off the stand on the theory that doesn't believe the currently proffered testimony on the basis that it will be subject to cross-examination. I don't understand that. Why would a judge keep that out? And then why would the judge then keep out what we would call 4-4-B information on the theory that some other witness is going to be impeached on another point? I don't understand that. Well, I guess my point here is that the law in New York is the opposite with respect to the federal system. I think you'd have to make a very difficult argument that the government would not introduce that evidence knowing of that impeachment of it and therefore nothing else would be. But that's a mighty difficult argument. You can't make the argument that the judge would. Especially given the fact that she would be, I would think, that the government could easily attack the, what are clearly exculpatory statements that she's making to the FBI, exculpatory with respect to herself in the sense of trying to distance herself from the murder weapons. So you have sort of an easy line of redirect there. She's got all kinds of reasons to say this. She could be afraid of Pruvoy. She could be hostile to Pruvoy. Well, Your Honor, I respect all of that and that may very well be the truth. But why did he say he didn't turn it over, Mr. A. D. A. Blank? Two reasons. Number one, I didn't believe her. That's wrong. Clearly that's wrong. And then number two, she'd make a bad prosecution witness. Those aren't reasons to deny. And that she was a bad prosecution witness, and this is something I want to ask the other side about, is false as a reason. That's just a false reason. Or at least, I think the statement that was later made by the prosecutor was, she would be a bad prosecution witness because her demeanor was no good. I mean, she would be a bad prosecution witness because she would be a defense witness on this subject. So that I thought was a pretty outrageous thing for a prosecutor to say. Yeah, on those points, I think that's clear where your argument is. I think that's why we're only talking about the materiality. I mean, the idea of not turning over evidence because you don't believe it is absurd. So I guess the thrust of my position with respect to the uncharged crimes is, you know, the judge has to weigh balance, the probity versus the prejudice, and limit the amount that comes in and weigh that, okay? How much is the need for it as opposed to what you have, okay? It just doesn't come in pell-mell. You have to weigh the balance. And in New York, the presumption is against admissibility. It's inadmissible. It's not the inclusionary approach of the Second Circuit. So the judge is a total mix of information. How do you know? They requested an order. They've got it sealed. The judge wouldn't even allow us to have the name of this person. And that goes towards the second prong of Brady, which is whether it was suppressed, whether it was kept from the defense. I totally understand the second prong. Tell me something. Wouldn't I be allowed, when you have such purposeful, direct intentions to suppress, to keep this information from the court, okay? They're hiding it from the court. They never told the judge about it. Look, I don't know, again, whether I would want to say that on the question of materiality, the degree of wrongdoing on the part of the government, and by the way, I'm inclined to agree with you that this was pretty darn bad on the part of the government. I'm inclined to agree with you, but I'm not sure that New York is unreasonable in not taking that into account. Unreasonable under the way the Supreme Court has defined it, in not taking that into account on materiality. Considering that the second prong of Brady, which is suppression, is described as willful oriented burden. So it takes into account already suppression or failure to disclose can be willful oriented burden. I think, let's just do this. Let's turn to your adversary. You've reserved, I've already lost my little piece of paper. Two minutes. So we'll come back to you. Why don't we hear from the government? And I don't think it's any surprise. I think the first thing many of us up here would like to know is what on earth was the government doing, not turning that over, on the theory that they didn't believe the witness. I think, would the government agree that that's wholly inappropriate? Yes, Your Honor. May it please the court, Morgan Dennehy, Officer of the Kings County District Attorney for the respondent. I'm not here today, Your Honors, to defend the judgment of this prosecutor. Clearly, he should have turned this over. The policy of my office has been for a very, very long time that assistants aren't supposed to engage in materiality analysis. When there's evidence that's favorable to the defense, we turn it over. But the defense attorney choose whether or not they want to use it and let it be vetted in front of the jury. Engaging in materiality analysis is a tricky business and it's not, it's counter, it runs counter to the spirit of doing justice as a prosecutor. So I'm not here to defend the conduct of the prosecutor in this case. However, what the prosecutor did in this case did not constitute a Brady violation for the materiality reason. There was no reasonable probability that had this statement by Alyssa Nafel been disclosed to the defense, the verdict in this case would have been different. Counsel, can you address the question of whether a Bruton violation, which may not be unreasonable in terms of this, and a non-material, what would have been a Brady violation, taken together as facts, not as there is a Brady violation because there isn't a Brady violation for a reason Judge Lynch said, and they're Bruton, which we may argue about, but whether that combination is so bad as a matter of facts in the case as to deprive this person of due process, because that's an issue on which we do not need to yield to your reasonableness. That's an issue which we can say, taken this whole thing together, was this a fair trial? I think it's a tough thing for the other side, but I think it's the best argument they have. So your honor is referring to this cumulative effect of these two alleged errors claim that's being asserted? We're not worrying about whether it is an actual found to be Brady because we have to follow New York and it isn't, but that doesn't keep us from asking whether the trial, I mean, one could conceive a situation in which there were enough of these things, none of them, and we'd say no, this trial can't stand it. Well, the problem with the cumulative effect of the errors claim is that it presupposes the existence of two constitutional violations in this case. No, it presupposes that there were facts that went to constitutional violations, but which, because of the state of the law, we cannot say was a constitutional violation, but that nonetheless, together, amount to something which makes it an unfair trial. I would argue that even if both of these alleged errors, well, one is not an alleged error, one is a brutal error, but the Brady error, which is, for all the reasons I've stated, is not a Brady violation, but if the cumulative impact of this were to be analyzed, it still wouldn't afford the defendant relief in this case. I'm not going to belabor, this is a very long trial, over a month, it's a 4,000 page transcript. My problem is that the best thing for you is that these are two different murders. On the other hand, and that makes a different case. But both of these things go to the credibility, ultimately, of one major witness. That's right. And if the combination of things was enough to destroy the credibility of that witness, then we might be in a position to say that. Now, I'm not saying that they're close to doing that, that's their job to argue, and they haven't. But I'm asking you, because that's what, if I were arguing the other side, I'd focus. Fair enough, Your Honor. So the witness in question is Sarkozov. And these two bits of evidence, that the jury didn't hear the Alyssa Mayfeld testimony about her denial of giving the tennis bag with the guns to Sarkozov, that's the Brady aspect. And the Bruton aspect is that the jury heard, improperly, a redacted version of the co-defendant's statement, in which the co-defendant was talking about being present at the burning of the car in the second homicide. And if the court was even permitted, and somehow could contort itself to look at these errors cumulatively, the cumulative effect of these errors did not deprive the defendant of a fair trial, and did not undermine the confidence in the verdict in this case, because of the sheer quantity of corroborative evidence for Sarkozov's testimony. So these two bits of evidence, one, the Bruton violation, propping up marginally Sarkozov's credibility, and the other, Mayfeld's testimony, marginally chipping away at it, wouldn't have caused the jury to completely discredit Sarkozov, because there were ten separate instances, compelling instances, in the testimony of other witnesses that corroborated aspects of Sarkozov's testimony so credibly that the jury understandably credited it and found the defendant guilty of these murders. Yeah, the Bruton violation, it's worth mentioning, you did mention, I just want to emphasize. This was a redacted version of the statement. This was not a statement that was put into evidence saying something about Cravoy. Cravoy was not identified. Cravoy is not identified in the statement. Now, I think we all agree that under Bruton, that's not enough to allow this to be put into evidence. But it's a very minor piece of corroboration if it's taken only on its face value to say that this event occurred. Exactly, Your Honor. And what it, what all it amounts to. And in most of the homicidal context, this statement only pertains to one of the two homicides. And the prosecutor, in a 134-page summation, referred to it twice, very fleetingly, in about a page and a half. So it wasn't harped upon by the prosecutor. Well, there's a lot of other evidence, as you suggested, that puts Cravoy at the scene of that murder. So this is, this admission by Ivanisevich, is that the name? Yeah, Ivanitsky. Ivanitsky, right, is not as- It's very minor. Minor corroboration, especially in light of the major corroboration. And I'm happy to recite the corroborative evidence from the case. I know you're not- Well, please do that, and it's helpful to have it. If you're going to argue that it's, there's a lot of other stuff. I would love to talk about it. Yes, thank you. So, Sokozov testified that before the Roitman murder, they test fired the guns in Anton Veselov's apartment. And they put phone books against the wall, but the bullets went through the phone books and into the wall. And upon proffering this information to the FBI, FBI agents went to Veselov's apartment, took apart a piece of the wall, and lo and behold, there were bullets. That testimony from that FBI agent corroborated that aspect of Sokozov's testimony. So Sokozov testified about obtaining these guns in a gym bag from the defendant's, at the time, wife, and using the guns, and then returning them to Arthur Joubetsky. Again, upon proffering this information to the FBI, the FBI went to Joubetsky's apartment and recovered this gym bag with these guns from Joubetsky's wife. And one of the guns, the shotgun, ballistics evidence matched up to a shotgun shell that was at the scene of the Roitman murder. So it was established that that shotgun in that tennis bag was the murder weapon in the Roitman case. In addition, there was testimony from a man named Michael Stern, who sold that very same shotgun to the defendant's brother in the months before the Roitman murder. Sokozov's testimony was also corroborated by the testimony of the medical examiner. The testimony of two civilian witnesses who walked by and saw the burned out car and testified about the location of the victim's body. That was consistent with what Sokozov described. The fire marshal testified about how that fire was started, also consistent with Sokozov's testimony. A witness, Nathan Gozman, testified that after the murder of Dieppe, he saw the defendant in possession of Dieppe's very distinctive fancy pool cue. And Gozman testified that defendant admitted to him that he killed Roitman because Roitman was a snitch, which is the same motive that Sokozov attributed to the murder. There was testimony from another civilian witness who drove Roitman to a restaurant on the night of the murder and saw him getting into a car with a defendant. And he testified that Roitman told him, wait 30 minutes, I'll be right back, and he never returned. And finally, there was evidence of defendant's prison telephone calls in which he's being reprised that years after these murders in 1992, this is 2005, that Ivanitsky's been picked up by the police, he's being charged with murders committed in 1992, and that there's a snitch. And they're speculating about who the snitch is, and it's revealed that the snitch is probably Sokozov. And the defendant is dumbfounded and extremely upset by this information, which is consciousness of guilt information. And actually, the district court judge called these telephone calls alarmingly incriminating. So in light of all of this evidence that corroborated Sokozov, any minor impeachment from Natho would have been insignificant, especially considering that Natho had a strong motive to lie. And it was testimony regarding an ancillary matter, the transfer of the- I don't think the impeachment is minor. I do think the corroboration is there. Fair enough, Your Honor. I think we have your argument. Thank you very much. Thank you, Your Honor. Why don't we hear from counsel for the appellant? Mr. Longone, you've reserved two minutes for rebuttal. Thank you, Your Honors. I'd like to initially say that the best way to lie, the Supreme Court has said, is to mix truth with lies. Where there's no doubt that Sokozov was involved in both of those murders. The question, and there's no doubt that Guzman was with Sokozov for two months at MDC, where they spoke entirely in Russian and were figuring out how to get out of a bad situation together. The fact that their testimonies don't entirely dovetail is not necessarily proof of the independent truthfulness of either of them. I'd like to inform the court that there was a precipient eyewitness to this case, a precipient witness named Paul Carpati, and he had given the police a description of the suspects as two male Hispanics in a white car. A white car with a broken trunk was subsequently stopped. The individuals inside it, who supposedly matched the description, were let go because they knew one of the officers. And no further investigation was done on that. Paul Carpati told the FBI that he saw the suspects carrying a double barrel shotgun. Sokozov said that the shotgun- The security guard outside- Yeah, he worked at a tennis club nearby and was walking by. And Sokozov testified it was a single barrel shotgun. So there are issues with respect to that. Supposedly, Sokozov said he shot a right man. And Grosman said that when he went to visit Creevoy in prison some years later, Creevoy said that he had shot Roitman. So that is, my point is there that, and that's just with the Roitman murder. Now with respect to the Dane Depp murder, there was no corroboration of that. The only thing they had was Sokozov's testimony and there was Sokozov's testimony of the event. There were the so-called bunter tool markings that were on shell casings that suggested that they may have came from the shell casings found at the scene. They did bunter tool marking on it and they were similar to a suggestive of coming from the same batch, perhaps, from some shells that were found at Drobetsky's house, apartment. It was never established and we know that the- I think we're going to hold you to the two minutes. We understand your arguments and we have the briefing, so thank you both very much. Thank you, Your Honor. Very helpful arguments, we appreciate it, and we will take the case on submission. Thank you, Your Honor, and give me ten seconds? Nope. Nope, okay. Nice try, though. Thank you. Thank you very much. All right, and we'll take the last case on the calendar, 22-956. David Demarest versus Town of Underhill et al. Mr. Demarest, I understand you would like to reserve two minutes for rebuttal, is that right? Yes, Your Honor, thank you. Okay, I think we can set the clock appropriately and feel free to start. And again, if you want, you can raise or lower that podium switch on the right to whatever brings the microphone to a comfortable height.  May it please the court. I, David Demarest, am representing myself due to the fact-dependent nature and extreme duration of conduct leading to the claims at issue today. When I built my home more than 20 years ago under a new dwelling permit issued to a 51.64 acre parcel on New Road, which is also known as High Road 26, no reasonable person could have ever predicted municipal defendants would willfully act, both individually and in collusion, to relentlessly and increasingly take from my bundle of clearly established property rights. If I may emphasize three points today, there will be first, the proper legal framework to consider the motion to dismiss takings and associated due process claims after Nick corrected the error of Williamson County. And second, the importance of fair and feasible standard of review, combined with genuine facts, are required to apply claim preclusion to causes of action presently before the court. And Mr. Demarest, if you wouldn't mind addressing, we know that this is one in a series of cases that have come before various courts, including, we understand, the Vermont Supreme Court. If you could take a minute during your presentation to explain why some of these claims are not precluded by virtue of the fact that there have been other cases decided before this one. I think you understand my point about Vermont law. Yes, thank you, your honor. In relation to claim preclusion, there is no nucleus of operative fact from prior claims and present claims, because the Kafkaesque maze of administrative proceedings in both the reclassification and the road maintenance considerations, which were actually handled non-chronologically, were all deferential to municipal defendant's discretion. So they had to ratify the discretion of the defendants because the Vermont courts, due to the statutory construction of 19 VSA 701 subsection 2, as applied due to the Ketchum precedent, eliminated the district court non-deferential jurisdiction. But the Vermont court did hold that there was claim preclusion, and we have to follow them. Interestingly, there was a dissent, and the dissenter is in our court, but that makes no difference. We have to follow what the Vermont court said about the claim preclusion building. I agree, your honor. However, the critical detail that I need to emphasize is if you look at A200, towards the third paragraph from the bottom, quote, no fact finding. So when it came to a Rule 75 deferential administrative appeal, there was a structural due process violation in that the municipal defendants were permitted to create their own record strategically to affect that taking over- Sir, your red light has come on, but since you're answering a question, why don't you keep talking for a minute? We will not deduct it from your two minutes. Just take an extra minute to answer Judge Calabresi's question. Thank you, your honor. So the difference between ratifying and making an order. The reclassification only dealt with whether or not it was going to be classified as a road or as a trail. And the catch and precedent is an error in saying that downgrading a road is not a taking. This issue cannot then have any merits before the Vermont courts, because as a matter of law, it was a deferential decision. And all of the prior claims involved that deferential discretion of the defendants, except for, I'll point out the 2001 attempt to reclassify town highway 26 was not valid, and that's on A193. And the county road commissioners, which actually found fully with the petitioners of which I was a co-party on A207. So the critical issue is the jurisdiction of the Vermont courts should be non-deferential involving claims, which may, but not that they are, but that they may implicate a taking of private property rights. And Mr. Demarest, I have another question, which may not be ultimately germane because we're dealing with so many of these obstacles to the merits, but I did want to ask about the merits. The underlying takings claim is that, in effect, you have a property right to a well-maintained road because there was a well-maintained road there when you bought the property? No, your honor, there's different facets. I'd just like to understand, your ultimate claim here is a taking of an aspect of your property rights. And as I understand it, what we're fighting about is, in effect, an obligation on the part of the town to maintain a road because there was a road there all along. I'm just trying to understand that. So, may I proceed? Yeah, please go ahead and answer the question. So, thank you. So, there's a nuance there, and in relation to public road maintenance, it actually is within the record that the Class 3 segment, the municipal defendants receive state money to maintain while refusing to do so. However, the claims at issue today are, one, the 19 VSA 717C statutory self-executing vested right of a landowner's access when a town highway is discontinued. And in the case of the reclassification, which is more properly termed a discontinuance as a town highway because a town highway as a matter of Vermont law is not, or sorry, a legal trail is not a town highway according to Vermont law. And then the other thing is, if a discontinuance were to occur, the vested property right at the time the town highway was first laid out guaranteed a reversion in property interest where the property would cease to be public and it would be both the private right of way for abutters and it would be the right of the property owners to exclude and exercise all the benefits of ownership from that former town highway. Is the point that you now have to spend money maintaining this road, whatever we call it, or is the point that you cannot develop the land as you might otherwise be able to do if there were a highway, just to understand what's going on? Yes. So the second point you made, I have been denied reasonable investment-backed returns. I've done all the engineering necessary for a nine lot subdivision, soil, setbacks, all that. In other words, the fact that they've changed it from a highway to a trail makes it now essentially impossible for you to develop that land in the way you would have been if it had been a highway. Correct, with one small caveat. It's up to their discretion. So if a different property owner had it, they could grant that access. I think we understand, and you've reserved two minutes for rebuttal, so we'll come back to you. Yes, Your Honor, and in terms of spatial layout, both of these materials were referenced. I don't know if I can give them to the court. No, the way we work in the Court of Appeals is whatever the record is that was developed, all the materials that you may have filed in the district court come to us, but once it comes on appeal, we basically can't add things to the record. We appreciate that you may have brought them as aids to the court. Well, they're also referenced in the pleadings. Oh, in that case, we'll have access to them if we need to. We can get anything we need from the district court. Great, thank you. That's not the appendix, so thank you very much. We'll come back to you in a minute, but why don't we hear from Mr. Kite for the appellate. Good morning, may it please the Court. To come straight to, I think, what is the central concern here about the nature of the highway and the right-of-way, the way highways are laid out in Vermont is the town select board identifies a certain width and then lays out and establishes the road and then compensates the landowners, and usually those roads are about three rods in width. Then, after that process happens, they remain a town road or a town highway and a public right-of-way until the town decides to discontinue the road, and that discontinuance is a throwing up of all town rights in the right-of-way and a relinquishment of the public access to that Mr. Demers is correct that when that process occurs, the right-of-way, whatever it is, will revert to the adjoining landowners, usually down the center line, unless there's some sort of clarity about the road not lying on one side of the property or the other. But in this case, that discontinuance did not happen because Vermont law allows for that public right-of-way to be used in a variety of ways. It can be either a traveled surface by vehicle, in which case it has to meet certain classifications for purposes of getting state money and width and safety measures for the roads, or it can be downgraded to a legal trail, which case remains a public right-of-way and is available for pedestrian traffic. Let me understand. When that happens, the person may not be able, as of right, to develop their land. If there were a discontinuance, that person would be able, taking over that, to make that the kind of road access that would allow the person to develop the land. But by using this device, what has happened is that whereas before the land could be developed, now it cannot. Now, isn't that a very different thing? Now, we may not be able to get to any of that because of Vermont decisions, but isn't the real issue here that the party says, by doing this, you have both done something which kept me then from developing and doing anything that I could do to make it develop? Isn't that what's going on? I'm not sure I understand the distinction you and I was trying to make because prior to downgrading to a legal trail, the property owner had limitations on what they could do to develop their property because it was a right-of-way, and that limitation extended the full width of the public right-of-way. All three roads, even though the traveled surface may only take up 20 feet, you know, three rides is like 50 feet, and the town right-of-way, the town still maintains control over that right-of-way and imposes restrictions on the landowner's opportunity to develop that property. He can do it as long as it's not inconsistent with the public purposes to which the road is being put. And all that's happened is that this public right-of-way has changed from a vehicular public right-of-way to a pedestrian public right-of-way. Did I misunderstand? I thought that Mr. Demarest's problem was not about wanting to develop this particular strip that is now a road, but that he can't develop his entire acreage because there's not going to be any way, and no one's going to want to buy a lot that can't be reached by vehicle. Yes, and the change in circumstance that produced that consequence for him occurred in 2012 when the town went ahead and reclassified the road. Which is something that the town tried to do even before he bought the property. The town did that in 2001. They did it wrongly because they failed to record a single piece of paper, and you know, sometimes that's and it was in this case. And so the town went ahead and redid it in 2012, doing exactly what they tried to do in 2001. And at that point, everything that Mr. Demarest needed to understand that his property rights might be diminished in some way existed. And now we're here in 2021. That causes your limitations argument. Yes. Okay, I think we understand your side. Mr. Demarest, you've reserved two minutes for rebuttal. And as you've seen with the other lawyers who come up when it comes to rebuttal, we try to hold to the timeline. So you have two minutes. Thank you, your honor. First, I would like to point out in relation to the statute at the time the town highway was laid out would be controlling on whether or not there was a reversionary property right. And section 30904 is very clear. Title to a discontinued highway, when a town highway is discontinued. And it's very clear that that would be for town highway purposes. And that vested private right, which coexists at the time that the town highway was established, is what has been taken, not whenever they did the reclassification, because that was a very narrow administrative proceeding, which as a matter of statutory construction, did not involve any alteration. And I'd like to really emphasize that the town's own trail ordinance clearly preserved the compelling personal and business access rights of any interested party. So it could not actually accrue a takings claim at that time. I would argue that was a strategic move. And when it comes to the 2001 reclassification attempt, I would like to point your attention to A186, where it very concisely shows why the town highway reclassification that was alleged in 2001 did not occur. Because they didn't want to allow the right to appeal, as those meeting minutes are indicative of. They have consistently tried to erode different facets of property rights gradually over time, similar to Sherman versus the town of Chester, where if you take any one slice of that pie, you might not have eaten the whole pie. But if you keep taking every single slice away, there is nothing left for the private rights that were previously clearly established. And the Supreme Court in both Nick and the Cedar Point nursery decisions is very clear that private property rights are not second class rights. So I would like to conclude that it would be perverse to allow the town to use the same delay to escape liability. Thank you very much. Again, well argued on both sides. We appreciate the presentations. We will go back over the briefs. And for now, though, we are taking this as we are taking all the cases today on submission, as well as I think I said earlier, the three motions that are on the calendar also on submission. So we would ask the clerk to send us to adjourn. Thank you.